# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF MICHIGAN
*********

**LATICIA PALMER,**

                 Plaintiff,                         Case No. 1:14-cv-513

v.                                          Hon. Paul L. Maloney

**BENTON HARBOR HOUSING COMMISSION**       <u>**BRIEF IN SUPPORT OF**</u>
<u>**PLAINTIFF'S MOTION FOR**</u>
and                                        <u>**PRELIMINARY INJUNCTION**</u>

**JUANITA GIBBS**, in her official capacity as
Executive Director of the Benton Harbor
Housing Commission,

                 Defendant.

_____/

## I.    <u>INTRODUCTION</u>

       Ms. Palmer seeks a preliminary injunction requiring the immediate reinstatement

of her Section 8 Housing Choice Voucher ("HCV") during the pendency of this case.

The Section 8 Housing Choice Voucher program provides a federal rental subsidy to

low-income households renting privately owned housing. Defendants Gibbs and Benton

Harbor Housing Commission ("BHHC") terminated Ms. Palmer's HCV in July 2013 for

an alleged failure to attend two "zero income interviews."  After Plaintiff contested the

proposed termination, a hearing was held where the Defendant-employee who ran the

zero income interview program also served as hearing officer.  No other witnesses

testified for the BHHC at the hearing. After the hearing, Plaintiff's HCV was reinstated

with conditions.  Before the conditions could be implemented, Defendants summarily

terminated Ms. Palmer's voucher without a hearing to address the subsequent events,

despite Ms. Palmer's request for such a hearing.  Ms. Palmer now lacks the assistance

of her HCV, has received court papers seeking her eviction from her rental unit, and faces the prospect of immediate homelessness.

Defendants' actions violated Ms. Palmer's constitutional due process rights as well as the United States Housing Act and its implementing regulations:  The hearing that was held was not adjudicated by an impartial decision maker and Ms. Palmer was denied an adequate opportunity to cross examine Defendants' witnesses.  Then, Ms. Palmer's voucher was terminated based upon alleged subsequent events without a new hearing.  The basis for the termination of the voucher in both instances is not adequate under federal law.  Accordingly, Ms. Palmer requests that this Court order the BHHC to immediately reinstate her voucher during the pendency of this matter and to waive the bond requirement under Federal Rule of Civil Procedure 65 because of her indigency.

## II.   FACTUAL BACKGROUND

Ms. Palmer was a participant in the HCV Program through the BHHC since 2003. While a participant, Ms. Palmer paid rent based on her income with the BHHC paying her landlord the difference up to an established rate.  At various times throughout Ms. Palmer's participation in the HCV Program, Ms. Palmer had no income and therefore the BHHC administered the payment of Plaintiff's full rental obligation. (*See* Plaintiff's Affidavit, Exhibit 1 ¶ 4).  At all times relevant to this case, Defendant Gibbs has been the Executive Director of the BHHC.  As such, Defendant Gibbs had and has full authority over the operation of the BHHC, including its HCV program, and to see that the program's policies and practices conform to law.

On or about December 2, 2010, the BHHC informed Ms. Palmer that she needed

2

to provide a monthly verification to the BHHC if she had zero monthly income (Exhibit 2).  The HCV Coordinator at the BHHC, at that time a Wendy Gunn, sent out a questionnaire form regarding income that Ms. Palmer regularly completed and returned to the BHHC via mail.  Ms. Palmer was not required to meet with anyone at the BHHC face to face.  Sometime at the end of 2012, the BHHC began requiring Ms. Palmer to attend a monthly face to face "zero income" interview (Exhibit 1 ¶ 6).  These interviews were set for the first Wednesday of each month at 11 a.m.  At the time the interview requirement began, Pamela Benson was the HCV Coordinator at the BHHC.  Notably, although BHHC's notices often refer to a provision in its Administrative Plan, the Administrative Plan that is publically available on its website, www.bhhcommission.org, does not contain the item referenced in these notices.  Instead, the Administrative Plan provision on the website states only that the BHHC will conduct an interim re-examination of zero income households every three months (*See* BHHC Administrative Plan, Chapter 11 at Appendix A).

Sheila Hill, another employee of the BHHC, conducted these zero income interviews.  Upon knowledge and belief, Ms. Hill is Ms. Benson's supervisor and/or manager (Exhibit 1 ¶ 6).  Additionally, Sheila Hill is the Quality Control Coordinator and the Capital Funds Coordinator for the BHHC.  Ms. Hill is also the designated Hearing Officer for the BHHC under the BHHC's Administrative Plan (*See* BHHC Administrative Plan, Chapter 12 at Appendix A).  At the monthly zero income interviews, Ms. Hill's presumed objective was to determine that Ms. Palmer was in compliance with the requirements of the HCV program and determine if Ms. Palmer had any unreported income.

On June 3, 2013, Ms. Palmer was scheduled for a job interview which conflicted with her monthly zero income interview (Exhibit 1 ¶ 8). Given the importance of attending a job interview, Ms. Palmer called Ms. Hill multiple times asking to reschedule the monthly interview. Ms. Hill did not return calls from Plaintiff regarding this request (Exhibit 1 ¶ 9).

Ms. Palmer did not hear back from Ms. Hill or anyone else at the BHHC until June 13, 2013, when Ms. Benson sent Ms. Palmer a letter informing her that Ms. Palmer needed to reschedule the June zero income interview for June (Exhibit 3). After additional attempts, Ms. Palmer was able to contact Ms. Hill and reschedule her June zero income interview, and the interview did take place during the month of June 2013 (Exhibit 1 ¶ 9).

In late June and early July 2013, Ms. Palmer's mother began suffering serious health complications from her type II diabetes, and amputation of her leg was being considered. Ms. Palmer made an emergency trip to Missouri, with the transportation and financial assistance of her father, in order to assist her mother (Exhibit 1 ¶ 10).

Because of this family medical emergency and being briefly gone from Michigan, Ms. Palmer called Ms. Hill and attempted to reschedule the zero income interview scheduled for July 2013 (Exhibit 1 ¶ 11). Again, Ms. Hill did not answer or return any of Ms. Palmer's calls. As soon as Ms. Palmer returned from Missouri, and just a few days after the missed interview, she went to the BHHC and attempted to meet with Ms. Hill for her zero income interview. Ms. Hill told Ms. Palmer that she had already been terminated from the HCV Program (Exhibit 1 ¶ 11-12).

The BHHC then sent Ms. Palmer a letter informing her that her HCV assistance

was terminated because she missed her June and July zero income interviews (Exhibit 4). The letter was inaccurate as to the June 2013 interview, which had been held on a rescheduled date, and made no reference to Ms. Palmer's repeated attempts to reschedule the July interview. Ms. Palmer submitted a written request for an informal hearing to challenge the termination of her voucher (Exhibit 1 ¶ 13).

The BHHC scheduled the informal hearing for July 25, 2013. At the informal hearing, Sheila Hill presided as the Hearing Officer - and Ms. Hill also presented all of the evidence on behalf of the BHHC and defended her own actions in the zero income interview process (Exhibit 1 ¶ 14-15). Because Ms. Hill was the Hearing Officer and controlled the hearing, cross examination of her by Ms. Palmer was difficult if not impossible, and there were no other witnesses that Ms. Palmer could question. Pamela Benson, HCV Coordinator at the BHHC, and Defendant Gibbs, Executive Director of the BHHC, attended the hearing but did not speak. Ms. Palmer was not represented by counsel at the hearing.

After the hearing, Ms. Hill sent Ms. Palmer a letter dated July 31, 2013 stating that Ms. Hill had decided not to immediately terminate Ms. Palmer's voucher, and instead indicated that Ms. Hill would be placed on probation (Exhibit 5). The letter further indicated that Ms. Hill was requiring Ms. Palmer to provide additional documentation to the BHHC, and requiring that Ms. Palmer sign a probationary agreement within 5 days. Ms. Hill also stated the requirement that Ms. Palmer was to continue to meet with her the first Wednesday of each month for her zero income interviews. (Exhibit 5).

Ms. Palmer did not receive the letter dated July 31, 2013 until Wednesday,

August 7, 2013 in her afternoon mail (Exhibit 1 ¶ 16-17).  Because Ms. Palmer does not receive her mail until approximately 2:00 pm, she had already missed the 10 am meeting with Ms. Hill that the letter scheduled for August 7, 2013.  So on that same afternoon, after she read the letter, Ms. Palmer again immediately went to the BHHC to try to meet with Ms. Hill for the zero income interview (Exhibit 1 ¶ 18).  Ms. Hill was not in the office, and Ms. Palmer spoke with Pamela Benson (Exhibit 1 ¶ 18).

Ms. Benson informed Ms. Palmer that she did not have any of the paperwork ("probation agreement") referenced in the letter for Ms. Palmer to sign, and that Ms. Hill was not in the office (Exhibit 1 ¶ 18).  Ms. Benson further told Ms. Palmer that she would have to get the paperwork directly from Ms. Hill, and that Ms. Hill would be contacted.  Ms. Palmer subsequently returned to the BHHC for her September 2013 zero income interview as required, but still was not presented with any probation agreement for her signature (Exhibit 7).

After August 7, 2013, Ms. Palmer never received any paperwork or further notification from Defendants.  Instead, in a letter dated September 11, 2013, Ms. Benson sent Ms. Palmer a final termination notice (Exhibit 6).  The BHHC asserted that its decision to terminate her HCV was based on her alleged failure to provide requested documentation, failure to report income, and failure to abide by the probationary stipulation (Exhibit 6).  The notice failed to provide specific information regarding any of the alleged grounds for termination, and failed to acknowledge that the probationary stipulation had never been provided to Ms. Palmer for her signature.  The September 11, 2013, termination notice also informed Ms. Palmer of her right to request an informal hearing within 10 days (Exhibit 6).

In response to the September 11, 2013 letter, Ms. Palmer timely submitted her written request for an informal hearing on September 16, 2013 (Exhibit 1 ¶ 19, Exhibit 7).  She also attempted to explain the basis for her disagreement with the termination (Exhibit 7).  Despite Ms. Palmer's timely request, the BHHC never scheduled or conducted a hearing related to the events occurring after the initial hearing.

In frustration, Ms. Palmer contacted the regional Department of Housing and Urban Development office in Detroit, which suggested that she attend a meeting of the Board of Directors of the BHHC to address her concerns (Exhibit 1 ¶ 21).  Based on this advice, Ms. Palmer attended the September 2013 meeting of the BHHC Board of Directors, and asked the Board to reinstate her HCV (Exhibit 1 ¶ 21).  Sheila Hill also attended the September meeting of the BHHC Board of Directors, and objected to Plaintiff's request.   The Board informed Ms. Palmer that she would receive a written decision from Ralph Crenshaw, the Board Commissioner.  Ms. Palmer never subsequently received any written decision from Mr. Crenshaw or BHHC Board member (Exhibit 1 ¶ 24).

Instead, Sheila Hill notified Ms. Palmer, by a letter dated October 14, 2013, that the decision to terminate Ms. Palmer's voucher was final and effective November 30, 2013 (Exhibit 8). That letter further said that Ms. Palmer had no further appeal rights.  In the October 14, 2013, termination letter, Ms. Hill noted that Ms. Palmer had missed her meeting on August 7, 2013 -  but acknowledged that missing the meeting could be explained by late mailing and receipt of the letter dated July 31, 2013.   Ms. Hill went on to include excerpts from the probation agreement that had never been provided to Ms. Palmer, and to state that Ms. Palmer's failure to sign the probationary agreement within

five business days was unacceptable. No reference was made to Ms. Palmer's repeated attempts to sign the probation agreement once she was made aware of it (Exhibit 8).

The BHHC insisted its termination was a final decision with no further appeal or due process rights, despite the fact that the decision was based on subsequent events that were not addressed at the July 2013 hearing.  The decision left Ms. Palmer without any HCV rental payment assistance.  As a result, her landlord is now seeking to evict Ms. Palme, who is now pregnant, from her rental unit (Exhibit 9).  Defendants' action leave Ms. Palmer and her unborn child facing imminent homelessness (Exhibit 1 ¶ 28).


### III.   LAW AND ARGUMENT

#### A.   Overview

Defendants violated Constitutional, statutory, and regulatory provisions protecting Ms. Palmer's rights by their failure to abide by required elements of due process in the July 2013 hearing process, and their failure to provide a hearing at all after the September 2013 termination.  Defendants did not have appropriate grounds for termination of the voucher in either circumstance.  The Court should grant the injunction because Ms. Palmer has a strong likelihood of success on the merits, she will in all likelihood become homeless without her housing assistance, the Defendants can afford to provide the temporary assistance, and the public has an interest in preventing homelessness.

Ms. Palmer has filed this action for the deprivation of rights created by the Due Process Clause of the 14th Amendment of the Constitution and the United States

Housing Act, actionable under Section 1983. *See Wright v Roanoke Redev. & Hous. Auth.,* 479 U.S. 418, 429; 107 s.Ct. 766 (1987). Additionally, the United States Housing Act provisions create individual rights that benefit Plaintiff and HCV participants, the provisions are not so vague or amorphous that enforcement would strain judicial competence, and the statute unambiguously imposes an obligation on the state actor involved. *Blessing v. Freestone,* 520 U.S. 329; 117 S.Ct. 1353 (1997), *Gonzaga University v Doe*, 536 U.S. 273; 122 S.Ct. 2268 (2002). The statutes implementing the HCV program are meant to impose a duty on public housing authorities, such as Defendants, to establish and implement administrative grievance procedures, including an opportunity for a hearing upon timely request, under 42 U.S.C. § 1437d(k). *See e.g. Stevenson v. Willis*, 579 F.Supp.2d 913 (N.D. Ohio 2008); *Daniels v. Housing Authority of Prince George's County*, 2012 WL 869003 (D. Md. 2012). Additionally, because federal regulations have the force of law, they may create enforceable rights under § 1983. *Loschiavo v City of Dearborn*, 33 F.3d 548, 551-53 (6th Cir. 1994), *cert. denied*, 115 S.Ct. 1099 (1995); *Boatman v. Hammons*, 164 F.3d 286, 289 (6th Cir. 1998).

**B.      Preliminary Injunction Standard**

The Supreme Court has established a four-part standard for evaluating a request for a preliminary injunction. *Winters v. National Resource Defense Council*, 555 U.S. 7, 129; 129 S.Ct. 365 (2008). "A plaintiff seeking a preliminary injunction must establish that he has a strong likelihood to succeed on the merits, that he is likely to suffer irreparable harm without the injunction, that the injunction would not cause substantial harm to others, and that the injunction is in the public interest." *Id.* at 129. The Sixth

Circuit follows this standard.  *See e.g. NAACP v. City of Mansfield, Ohio*, 866 F.2d 162, 166 (6th Cir. 1989).  Ms. Palmer satisfies these requirements and the Court should enter the preliminary injunction.

### C.    Strong Likelihood of Success on the Merits

This motion for a preliminary injunction should be granted because Ms. Palmer has a strong likelihood of success on the merits due to Defendants' violations of her Constitutional and statutory rights.

### 1.    The requirements of Constitutional due process and the United States Housing Act related to the termination of HCVs

Receipts of governmental benefits are property interests requiring due process protection.  *Goldberg v Kelly*, 397 U.S. 254, 262; 90 S.Ct. 1011 (1970).  The Sixth Circuit has further held that "participation in a public housing program is a property interest protected by due process."  *Davis v. Mansfield Metro. Hous. Auth.*, 751 F.2d 180, 184 (6th Cir. 1984).  *See also Ressler v. Pierce*, 692 F.2d 1212, 125 (9th Cir. 1982) (holding that participants in the HCV program have protectable property interests).

In order to provide required due process protections under the Fourteenth Amendment to the Constitution, a housing authority must comply with five mandates prior to terminating a recipient's housing assistance benefits:  (1) timely notice from the housing authority stating the basis for the proposed termination; (2) an opportunity by the tenant to confront and cross-examine each witness relied on by the housing authority; (3) the right of the tenant to be represented by counsel; (4) a decision, based

solely on evidence adduced at the hearing, in which the reasons for the decision are set forth; and (5) an impartial decision maker.  *See Goldberg*, 397 U.S. at 266-71; *see also Jones v. Lansing Housing Commission,* 2003 WL 26118817 (W.D.Mich. 2003); *Evans v. Housing Authority of the City of Raleigh*, 2006 WL 6872567 (E.D.N.C. 2006).

An "impartial decision maker is essential" to due process.  *Goldberg*, 397 U.S. at 271.  A hearing officer is not impartial when he or she "participated in making the decision under review."  *Id.*  While "mere familiarity" with a case will not disqualify a decision-maker, *Hortonville Joint School District Number 1 v. Hortonville Educational Association*, 426 U.S. 482, 493; 96 S.Ct. 2308 (1976), the decision-maker must base her conclusion on "evidence adduced at the hearing."  *Goldberg*, 397 U.S. at 271.

Housing commissions generally fulfill this obligation by separating their investigative and executive functions from their adjudicative functions.  *Stevenson v. Willis*, 579 F.Supp.2d 913, 920 (N.D. Ohio 2008).  Impermissible bias occurs where "a *single individual* in the agency's employ perform[s] the dual functions of advocate and adjudicator."  *Id.*  In *Stevenson*, the presiding officer at an informal hearing presented the evidence against the housing participant, thus serving as both advocate and judge.  *Id.*  Courts consequently find violations of due process where "the decision maker was engaged in both adjudicative and executive functions in violation of the separation of powers."  *Hammond v. Baldwin*, 866 F.2d 172, 177 (6th Cir. 1989).

Under the United States Housing Act, public housing authorities (PHAs) must provide a hearing when they take certain adverse actions against program participants.

42 U.S.C. § 1437d(k)(2).[1]  If a PHA terminates assistance based on a participant "family's action or failure to act," it must provide a hearing.  24 C.F.R. § 982.555(a)(1)(v).  In terms of the required hearing process, the PHA must grant participants terminated from the program "an opportunity for a hearing before an impartial party . . . "  42 U.S.C. § 1437d(k)(2).

The implementing regulations allow hearings to be "conducted by any person or persons designated by the PHA, other than a person who made or approved the decision under review or a subordinate of this person."  24 C.F.R. § 982.555(e)(4).  The statutory and regulatory scheme requires impartiality as also required under *Goldberg*.

Courts have uniformly upheld and enforced the United States Housing Act regulatory hearing requirement.  The Sixth Circuit, citing 24 C.F.R. § 982.555(a)(1)(v), stated that a housing voucher "participant must have an opportunity for an informal hearing to challenge the basis for the termination decision and to consider whether the decision comports with federal law."  *Woods v. Willis*, 515 Fed.Appx. 471, 474 (6th Cir. 2013).  The procedures listed in the regulations "provide the minimum threshold of process due [for housing voucher participants]."  *Lansing Hous. Comm'n*, 2003 WL 26118817, at *5.  *See also Basco v. Machin*, 514 F.3d 1177, 1181–83 (11th Cir. 2008) (enforcing the hearing requirement and holding that the burden of persuasion at the hearing rests with the PHA).

**2.**     **The July 2013 Informal Hearing Process Failed to Provide Important Procedural Due Process Safeguards to Ms. Palmer,**

---

[1] At least one court has found that the Department of Housing and Urban Development (HUD) regulations may not provide full constitutional due process requirements.  *See Hendrix v. Seattle Housing Authority,* 2007 WL 3357715 (W.D.Wa. 2007).

### Violating Ms. Palmer's Constitutional and Statutory Due Process Rights

Defendants' employee and designated Hearing Officer, Sheila Hill's, job duties impermissibly straddled both executive and adjudicative functions.  As the caseworker who conducted the zero income interview process and was significantly involved in the decision to terminate Ms. Palmer's HCV, Ms. Hill had more than "mere familiarity" with the case when she then served as the decision maker at the July 2013 hearing.

At the monthly zero income interviews, Ms. Hill's objective was to determine if Ms. Palmer complied with the requirements of the HCV program and determine if Ms. Palmer had any income.  Ms. Palmer found Ms. Hill's behavior at these interviews to be confrontational and threatening, and felt that Ms. Hill accusing her of lying about her income (Exhibit 1 ¶ 7).  Ms. Palmer had further ongoing communication difficulties with Ms. Hill when she tried to reschedule the June 2013 zero income interview due to the scheduled job interview (Exhibit 1 ¶ 8-9).   However, Ms. Palmer was finally able to reschedule and attend this required appointment in the month of June.

When Ms. Palmer had to reschedule her July 2013 zero income interview due to her mother's medical emergency, she found, again, that she had substantial difficulties receiving any response from Ms. Hill (Exhibit 1 ¶ 10-11).    Ms. Palmer even went, in person, to the BHHC immediately upon her return to Michigan to make sure she complied with Defendants' requirements and communicated with Ms. Hill (Exhibit 1 ¶ 12).  When Defendants made the decision to terminate Ms. Palmer's HCV, it appears likely Ms. Hill made, approved, and/or participated in the decision – as she was the principal person with whom Plaintiff had contact.

Then, Ms. Hill presided over the hearing to determine whether there was a violation of program requirements such that Ms. Palmer should lose her HCV rental assistance (Exhibit 1 ¶ 14).  Because of the substantial communication difficulties in the zero income interview scheduling process, Ms. Hill's conduct as that caseworker was an important issue to be reviewed at the termination hearing.  However, as the hearing officer, Ms. Hill was in a powerful position to defend her own conduct and did so. Moreover, Ms. Hill was the only individual presenting evidence on behalf of the BHHC at the hearing (Exhibit 1 ¶ 14). This made it very difficult for Ms. Palmer to effectively cross examine Ms. Hill, because of Ms. Hill's dual role as the hearing officer and the deference due to an individual acting as decision-maker.  Ms. Hill's involvement in the case prior to the hearing rendered her an inappropriate hearing officer, because she was not and could not be impartial, as required.

The instant case is quite similar to the *Stevenson* case.  *Stevenson*, 579 F. Supp. 2d at 913.  In that case, the PHA sought to terminate the participant's HCV.  At the hearing, the hearing officer presented two documents from the PHA file but the PHA did not present any other witnesses or testimony.  The hearing officer also allegedly relied on a phone conversation with the participant's landlord, even though the landlord was not present at the hearing.  The hearing officer then issued a decision requiring the participant to set up a payment plan, in essence a probationary agreement.  When the participant failed to do so, the participant was then removed from the HCV program. The court found that the hearing officer, as both an advocate constructing the case for the PHA as well as the adjudicator, was acting impermissibly.  *Id.* at 920.  In this

situation, Ms. Hill was at least as personally involved in presenting the Defendants' case as the hearing officer in *Stevenson,* and her mixed roles should likewise be disallowed.

Accordingly, under the Due Process Clause of the 14th Amendment to the Constitution as well as the United States Housing Act and its regulations, the hearing process was too substantially flawed to protect Ms. Palmer's due process rights.

      **3.**    **BHHC's Failure to Provide Ms. Palmer a Hearing on the September 2013 Termination Violates Constitutional and Statutory Requirements**

In the aftermath of the flawed July 2013 hearing, Plaintiff's HCV was reinstated with conditions imposed by the zero income interview case worker and hearing officer, Ms. Hill.  However, after subsequent events, Defendants then completely disregarded Ms. Palmer's due process rights by again terminating her voucher in September 2013. This second termination was then affirmed in October 2013, without any hearing.  As discussed above, both under the federal Constitution and the United States Housing Act, PHA must provide a participant an opportunity for a hearing prior to the termination of a HCV voucher.

After the July 2013 hearing, Ms. Hill sent Ms. Palmer a letter dated July 31, 2013 stating that Ms. Hill had decided not to terminate Ms. Palmer's voucher (Exhibit 5). Instead, Ms. Hill decided that Ms. Palmer should be placed on probation and should sign a probationary agreement within 5 days (Exhibit 5).  Ms. Hill also stated the requirement that Ms. Palmer was to meet with her the first Wednesday of each month for her zero income interviews and requested some documents be provided. (Exhibit 5).

Unfortunately, Ms. Palmer did not receive the letter dated July 31, 2013 until

Wednesday, August 7, 2013 in the afternoon and so had already missed her 10:00 meeting with Ms. Hill that same day (Exhibit 1 ¶ 16).  But upon receipt of the letter and on the same afternoon, Ms. Palmer went to the BHHC to try to meet with Ms. Hill for the zero income interview, just a few hours late, and also to sign her probationary agreement (Exhibit 1 ¶ 18).  However, Ms. Hill was unavailable and Ms. Benson was unable to locate the probationary agreement for Ms. Palmer's signature.  No probationary agreement was ever provided to Ms. Palmer (Exhibit 1 ¶ 18).

Ms. Palmer attended her September 2013 zero income interview at the BHHC as required (Exhibit 7).  Ms. Hill first raised a failure to report income changes in the September zero income meeting as Ms. Hill had examined the information sheets and believed, erroneously, that Ms. Palmer had left out income (Exhibit 7).  Ms. Palmer still was not provided with the probation agreement for her signature at that meeting.

Instead, in a letter dated September 11, 2013, Ms. Benson sent Ms. Palmer a final termination notice (Exhibit 6).  The BHHC based its decision on Ms. Palmer's alleged failure to provide requested documentation, failure to report income, and failure to abide by the probationary stipulation (Exhibit 6).  The notice fails to provide specific information regarding the grounds or to identify when Defendants actually provided Ms. Palmer the probationary agreement for signature.  The September 11, 2013, termination notice did inform Ms. Palmer of her right to request an informal hearing within 10 days (Exhibit 6).

Ms. Palmer submitted a timely written request for an informal hearing related to the September 11, 2013 termination on September 16, 2013 and also attempted to explain the basis for her disagreement with the termination (Exhibit 7).  Despite Ms.

Palmer's timely request, the BHHC never scheduled or conducted a hearing related to the alleged subsequent events (Exhibit 1 ¶ 20).   When no hearing was scheduled, Ms. Palmer attended a BHHC Board meeting and asked the Board to reinstate her voucher (Exhibit 1 ¶ 22).  Sheila Hill also attended the September meeting of the BHHC Board of Directors (Exhibit 1 ¶ 23).  At the meeting, Sheila Hill argued the Defendant's reasons for termination and told the Board of Directors that the BHHC should not reinstate Ms. Palmer's HCV Voucher (Exhibit 1 ¶ 23).

Ms.  Hill then notified Ms. Palmer, by a letter dated October 14, 2013, that the decision to terminate Ms. Palmer's voucher was final (Exhibit 8). She noted that Ms. Palmer missed her meeting on August 7, 2013 (but also indicating that missing the meeting could be explained by failure to get the final decision letter dated July 31, 2013 in time) but said that Ms. Palmer's failure to sign the probationary agreement within five business days was unacceptable.  The letter does not reference to Ms. Palmer's attempts to sign the probation agreement as soon as she learned of the matter (Exhibit 8; (Exhibit 1 ¶ 17-18)).  It appears that the two other bases for proposed termination outlined in the September 2013 letter — failure to report income and failure to provide documentation — were no longer considered bases for termination.  The letter indicates that the decision is final and not subject to any additional hearing or appeal rights (Exhibit 8).

Defendants fell far short of the requirements for due process in its final termination of Ms. Palmer's HCV.  The final termination rested on different and subsequent grounds from the prior attempted termination and these charges were never reviewed in an impartial hearing.  Defendants have attempted to evade the hearing

requirement by stating in their probationary agreement that it can be summarily terminated.  However, the Constitution, United States Housing Act and regulations are clear: if a PHA intends to terminate a participant's HCV then the PHA must hold a hearing.  Defendants' failure to do so here is a violation of Plaintiff's rights.

    **4.**    **The Alleged Violations of the HCV program are not permitted grounds for termination under federal law or the Defendants' own Administrative Plan**

Defendants' final termination letter dated October 14, 2013, indicates that Defendants decided to terminate Ms. Palmer's HCV because of "Failure to comply with the established Program Policies and Procedures."  (Exhibit 8).  Under the HCV program, PHAs may terminate a HCV for specific, enumerated reasons, however, the reasons identified by Defendants in each notice to Plaintiff were not sufficient under federal law and their own Administrative Plan to serve as a basis for termination of Ms. Palmer's HCV.

Terminations based upon a family's actions or failure to act are listed in 24 C.F.R. § 982.552 and include discretionary terminations based on a participant's breach of "family obligations."  *Id.* at § 982.552(c)(1)(i).  "[F]amily obligations," in turn, are spelled out in 24 C.F.R. § 982.551.  A family obligation may be breached by failure to provide recertification information, failure to establish citizenship or immigration status, failure to provide information is not true and complete, refusal to permit the PHA to inspect the unit, or failure to inform the PHA of changes in household composition.  24 C.F.R. § 982.552(c).  These grounds are exclusive and may not be expanded by the PHA to include additional reasons.  *See* 49 Fed. Reg. 12215, 12217 (Mar. 29, 1984).

Courts have likewise held that PHAs may not expand this exclusive list of family obligations.  *See  e.g. Ali v. Dakota County Cmty. Dev. Agency*, 2009 WL 511158 (Minn. Ct. App. Mar. 3, 2009), *Ellis v. Ritchie,*803 F.Supp. 1097, 1101 (E.D.Va. 1992), *Hill v. Richardson*, 740 F.Supp 1393 (S.D.Ind. 1990), *Harris v. Hous. Autho. Of Raleigh*, 2004 WL 5229754 (N.C. Super. Ct. June 23, 2004).

Additionally, PHAs must adopt a written Administrative Plan establishing local policies for administering the HCV Program.  24 C.F.R. 982.54(a).  The HCV administrative plan must state PHA policy on matters for which the PHA has discretion to establish local policies.  The HCV administrative plan must be in accordance with HUD regulations and requirements.  24 C.F.R. 982.54(b).  Every PHA must administer its HCV Program in accordance with its HCV administrative plan as well as federal regulations.  24 C.F.R. § 982.54(c).

In *Ali*, the PHA required that the participant attend in-person recertification appointments and then terminated the participant's voucher when she missed those appointments.  *Ali* at 511158.  The court decided that the participant's failure to attend appointments and failure to "cooperate" were not violations of the federal regulations and the alleged requirement was not even contained in the PHA's own administrative plan.  Accordingly, the court reversed the termination and restored the participant's voucher.  In another case, the PHA alleged that the participant failed to report an increase in household income due to child support.  *McClarty v. Greene Metro. Hous. Auth.*, 196 Ohio App. 256, 262 (2011).  There, the court found that, without a showing that the participant had an intent to deceive or pattern of conduct demonstrating serious disregard for family obligations under 24 C.F.R. § 982.551, the termination of the

participant's housing benefits was inappropriate. *Id.* at 262.

The "obligation" at issue here appears to be Defendants' requirement for monthly, in person, zero income interviews and submission of income information at those interviews. Under the United States Housing Act regulations, a participant's family obligations include the requirement to "supply any information requested by the PHA or the HUD for use in a regularly scheduled reexamination . . . of family income and composition in accordance with HUD requirements." *Id.* at § 982.551(b)(2). While recertifications are permitted and, in some cases, required under the regulations, the regulations do not require a monthly recertification for zero income participants and do not require in-person meetings. Additionally, Defendants' own Administrative Plan does not require a monthly recertification process but instead requires a recertification every three months, and does not contain the specific requirement of an in-person interview.

Here, the original allegation was that Ms. Palmer missed the June and July zero income interviews (Exhibit 4). This was inaccurate as Ms. Palmer did make up her June interview and made attempts to make up her July interview (Exhibit 1 ¶ 9, 11-12), and in any event these actions were not required by regulations or BHHC's own Administrative Plan. Additionally, there was no indication that Ms. Palmer was attempting to deceive the BHHC or acting in complete disregard of her obligations under the program. Ms. Palmer should have been reinstated to the HCV program without the need for the probationary agreement.

Then, Ms. Palmer's HCV was terminated due to her alleged failure to sign the probationary agreement (Exhibit 8), which never should have been required and again is not a basis for termination under the federal regulations or the BHHC Administrative

Plan.   There was no indication that Ms. Palmer was attempting to deceive the BHHC or acting in complete disregard of her obligations under the program.  In fact, Ms. Palmer made repeated attempts to obtain the probationary agreement and also attempted to comply with the requirements of the July 2013 hearing decision, including attending the September 2013 zero income interview (Exhibit 1).

Accordingly, there was no basis under the United States Housing Act or BHHC's Administrative Plan to terminate Ms. Palmer's HCV at either point in time.


### D.    Irreparable Harm

The BHHC irreparably harmed Ms. Palmer by terminating her housing voucher. She now must scramble to find another home or, more likely, be forced into homelessness.  Ms. Palmer receives no income other than governmental benefits and cannot currently afford unsubsidized housing.  She will thus likely be evicted and not have the means to find alternative housing (Exhibit 1 ¶ 28 Exhibit 9).

The BHHC's termination decision also impairs Ms. Palmer's ability to obtain future housing assistance.  The regulations allow a PHA to reject an applicant who has prior terminations from a housing program, 24 C.F.R. § 982.552(c)(iii), and the BHHC's administrative plan states that the "BHHC **will** deny assistance to an applicant family if . . . [a]ny PHA has ever terminated assistance under the program for any member of the family."  BHHC, *Administrative Plan* ch. 3, pt. 3(C).  Ms. Palmer's termination, then, is likely a permanent ban from the housing program.

Numerous courts have found irreparable harm in similar circumstances.  The court in *Badri v. Mobile Housing Board* listed numerous cases holding that "significant

reductions in public benefits to impoverished citizens constitutes irreparable injury to them." 2011 WL 3665340 (S.D. Ala. Aug. 22, 2011). The court ruled that the threat of being forced into "cheaper, less satisfactory housing" created an irreparable injury. *Id. See also Litsey v. Hous. Auth. of Bardstown*, No. CIV.A. 399CV114H, 1999 WL 33604017, at *7 (W.D. Ky. April 1, 1999) (finding that termination of housing voucher constituted irreparable harm); *Basham v. Freda*, 805 F. Supp. 930, 932 (M.D. Fla. 1992) (finding that threat of homelessness constituted irreparable injury), *aff'd* 985 F.2d 579 (11th Cir. 1993). Ms. Palmer's foreseeable homelessness represents an irreparable injury meriting injunctive relief.

### E.    No Substantial Harm to Defendants

In contrast to Ms. Palmer, the BHHC faces negligible harm if the Court grants the injunction. The BHHC would be required to reinstate the subsidized tenancy and incur costs for rent and minimal accompanying administrative costs. If the voucher has not been re-assigned, the rental funds will come from HUD monies, not the BHHC. Moreover, the Defendants might obtain reimbursement of the rental payments if it prevails.

The burden to Defendants does not outweigh the significant, possible harm of homelessness Ms. Palmer faces. Courts weighing similar harms have found that the interests of terminated participants outweigh those of the PHA. *See Sanders v. Sellers-Earnest*, 768 F. Supp.2d 1180, 1188 (M.D.Fla. 2010) ("[T]he threatened injury to Plaintiff [from the voucher termination] outweighs whatever damage the injunction may cause Defendant."); *Litsey*, 1999 WL 33604017 (finding that the PHA's harms did "not seem

substantial" compared to the irreparable injury suffered by the plaintiff). The mere possibility that the BHHC will spend funds does not overcome the irreparable harm to Ms. Palmer.

### F.    Injunction is in the Public Interest

Restoring Ms. Palmer's voucher will serve the public interest by preventing her from becoming homeless during her pregnancy. The objective of the HCV program is to assist low-income families in obtaining "decent, safe, and sanitary housing." 24 C.F.R. § 982.1(a). "[T]here is a great public interest in guaranteeing that those in financial need are not unreasonably terminated from public assistance benefits." *Basham v. Freda*, 805 F. Supp. 930, 932 (M.D. Fla. 1992. This is particularly true for female heads of homeless households, who suffer significant burdens compared to the general population. Linda Weinreb, et al., *Health Characteristics and Medical Service Use Patterns of Sheltered Homeless and Low-Income Housed Mothers*, 13 J. of General Internal Medicine 389 (1998). Members of this unfortunate group face a "significant illness burden" and have "serious health conditions and adverse lifestyle practices that place them at high risk of further adverse health outcomes." *Id.* at 396. Without her voucher, Ms. Palmer will enter this class of individuals and be subject to the vicissitudes of homelessness.

Moreover, the public has an interest in the proper administration of the housing program at the BHHC. This program seeks to serve the public interest by assisting low-income families. As a public program, it has an obligation to maintain effective

administration and to comply with the law.  The procedures the BHHC followed in this case do not represent appropriate administration and do not comply with applicable law.

### G.    The Bond Requirement Should be Waived

Federal Rule of Civil Procedure 65(c) provides that the "court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  However, courts have waived this requirement where the movant demonstrates financial inability to pay and a likelihood of success on the merits.  *Guillermety  v. Sec'y of Educ.*, 241 F. Supp.2d 727, 759 (E.D. Mich. 2002) (holding that plaintiff was not required to post security where he demonstrated likelihood of success on the merits and his financial inability to pay a bond).  The court in *Sanders v. Sellers-Earnest* reached a similar result, waiving the bond requirement in light of the plaintiff's clear inability to pay.  768 F. Supp.2d at 1188.

Ms. Palmer receives no income aside from public assistance.  She lacks the ability to pay for a bond but meets the other requirements for a Preliminary Injunction. Thus, the bond requirement should be waived.

### IV.    <u>CONCLUSION</u>

The BHHC violated Ms. Palmer's due process rights and also the regulations codified to ensure those rights.  The BHHC failed to provide an impartial decision-maker throughout the hearing process.  Moreover, it never allowed any review of its final

decision to terminate Plaintiff's HCV.  As a result of these deficient procedures, Ms. Palmer faces the irreparable harm of homelessness.  The costs to the BHHC to temporarily restore the subsidy would be slight.  Ms. Palmer's impecunious financial situation also makes waiving the bond requirement appropriate.  Therefore, Ms. Palmer is entitled to a preliminary injunction reinstating her housing voucher.

<table>
<tbody>
<tr><td></td><td>Respectfully Submitted,</td></tr>
</tbody>
</table>

|  |  |
|---|---|
| Dated:  May 29, 2014 | /s/ Karen Merrill Tjapkes<br>Karen Merrill Tjapkes (P58467)<br>Legal Aid of Western Michigan<br>Attorneys for Plaintiff<br>89 Ionia Ave NW Suite 400<br>Grand Rapids, MI 49503<br>(616) 774-0672 ext. 120<br>*ktjapkes@legalaidwestmich.net* |
| Dated:  May 29, 2014 | /s/ Kassie N. Evenson<br>Kassie N. Evenson (P75113)<br>Legal Aid of Western Michigan<br>Attorneys for Plaintiff<br>901 Port Street<br>P.O. Box E<br>St. Joseph, MI 49085<br>(269) 983-6363 ext. 226<br>*kevenson@legalaidwestmich.net* |